**CASE NO. 26-10063-CC**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**CRISTIAN DIAZ-PIEDRA,**

Appellant,

-vs-

**FANEUIL ENTERTAINMENT, INC., et. al.**

Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 25-60953-CIV-SMITH
HON. RODNEY SMIITH

---

# APPELLEES' ANSWER BRIEF

---


Luke Lirot, Esq.
Florida Bar No. 714836
Rachel Ricks, Esq.
Florida Bar No. 1049469
**LUKE CHARLES LIROT, P.A.**
2240 Belleair Road, Suite 190
Clearwater, Florida 33764
Telephone: (727) 536-2100
Email: team@lirotlaw.com
*Counsel for the Appellees*

**INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1, Fed. R. App. P. and Rules 26.1-1 and 26.1-2, of the Rules of the United States Court of Appeals for the Eleventh Circuit, counsel for the Appellees give notice of the following parties or corporations that have an interest in the outcome of this case or appeal:

Carlos Leach, Esq. – Trial counsel for the Appellant;

Cristian Diaz-Piedra – Plaintiff-Appellant;

Earl I. Higgs, Jr. – Appellate counsel for the Appellant;

Eric Langan – Defendant-Appellee;

Faneuil Entertainment, Inc., d/b/a CHEETAH III – Defendant-Appellee;

Higgs Law, P.A. – Appellate counsel for the Appellant;

Jose R. Rodriguez – Defendant-Appellee;

Luke Charles Lirot, P.A. – Counsel for the Defendant-Appellees;

Luke Lirot, Esq. – Counsel for the Defendant-Appellees;

Rachel Ricks, Esq. – Counsel for the Defendant-Appellees;

Rodney Smith – United States District Judge

Ryan J. Glover – Former trial counsel for the Plaintiff-Appellant;

The Leach Firm, P.A. - Former trial counsel for the Plaintiff-Appellant;

The Set Enterprises, Inc. – Defendant-Appellee.

## CORPORATE DISCLOSURE STATEMENT

Counsel for the Appellees certifies that no publicly traded company or business entity, apart from that listed above, has an interest in the outcome of this case or appeal.

*/s/ Luke Lirot*
Luke Lirot, Esq.

## STATEMENT REGARDING ORAL ARGUMENT

The Appellees request oral argument in this matter because the depth and scope of the issues of this case are too extensive to be conveyed only in writing. To that end, we join the Appellant in requesting oral argument, as found on page iv of the Amended Opening Brief.

**TABLE OF CONTENTS**

INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .... ii

CORPORATE DISCLOSURE STATEMENT …………………………………..... iii

STATEMENT REGARDING ORAL ARGUMENT …………………………....... iv

TABLE OF CONTENTS ……………………………………………………….. v

TABLE OF AUTHORITIES ……………………………………………....... vi

STATEMENT OF JURISDICTION …………………………………………… 1

STATEMENT OF THE ISSUE ……………………………………………….. 2

STATEMENT OF THE CASE ………………………………………………… 3

I. BACKGROUND FACTS ……………………………………………… 3

II. PERTINENT COURSE OF TRIAL-LEVEL PROCEEDINGS …….. 7

SUMMARY OF THE ARGUMENT …………………………………………… 9

ARGUMENT …………………………………………………………………… 12

I. THE DISTRICT COURT'S DECISION MUST BE AFFIRMED BECAUSE THE RECORD EVIDENCE DEMONSTRATED DIAZ-PIEDRA WAS AN INDEPENDENT CONTRACTOR UNDER THE FLSA ………………………………………………………… 12

A. SUMMARY JUDGMENT STANDARD ...……………….... 12

B. THE FAIR LABOR STANDARDS ACT AND ITS APPLICATION ……………………………………………... 13

C. DIAZ-PIEDRA CONTROLLED ALL MATERIAL ASPECTS OF HIS PERFORMANCE ………………………………….. 15

D. DIAZ-PIEDRA CONTROLLED HIS OWN OPPORTUNITY FOR PROFIT AND LOSS ………………………………….. 19

E. DIAZ-PIEDRA INVESTMENT EXCEEDS THE CLUBS INVESTMENT. ……………………………………………... 20

F. DIAZ-PIEDRA REQUIRED THE SPECIAL SKILL NECESSARY FOR INDEPENDENT CONTRACTOR STATUS. ………………………………………………….. 21

G. THERE IS NO PRESET DURATION OF EMPLOYMENT .. 23

H. DJS ARE NOT INTEGRAL TO THE CLUBS' BUSINESS ... 25

II. WHETHER THE DISTRICT COURT ERRED IN DENYING DIAZ-PIEDRA'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DISMISSING DIAZ-PIEDRA'S CASE WHEN THE RECORD EVIDENCED DEMONSTRATED DIAZ-PIEDRA WAS NOT ENTITLED TO DAMAGES, INCLUDING LIQUIDATED DAMAGES? ……………....…………………………………... 27

A. EVEN IF DIAZ-PIEDRA COULD BE CLASSIFIED AS AN EMPLOYEE, THE CLUBS' GOOD-FAITH AND REASONABLE-GROUNDS DEFENSE PRECLUDES AN AUTOMATIC AWARD OF LIQUIDATED DAMAGES UNDER 29 U.S.C. § 260. …………………………….... 28

CONCLUSION ………………………………………………………….. 36

CERTIFICATE OF COMPLIANCE …………………………………………….. 37

CERTIFICATE OF SERVICE ………………………………………………… 37

## TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Aidone v. Nationwide Auto Guard, L.L.C.*,
295 F.R.D. 658, 662–63 (S.D. Fla. 2013) ……………………………………….... 32

*Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*.,
515 F.3d 1150, 1163 (11th Cir. 2008) ……………………………………….... 30, 34

*Amiable v. Long & Scott Farms*,
20 F. 3d 434, 441 (11th Cir. 1994) ……………………………………….…. 16

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) ………………. 13

*Brouwer v. Metro Dade Cnty*.,
139 F.3d 817, 819 (11th Cir. 1998) ………………………………………….. 14

*Davila v. Menendez*,
717 F.3d 1179, 1186 (11th Cir. 2013) ……………………………………….… 30

*Diego v. Victory Lab, Inc*.,
282 F.Supp.3d 1275, 1281 (S.D. Fla. 2017) ……………………………………... 16

*Dybach v. State of Fla. Dept. of Corrections*,
942 F.2d 1562, 1566–67 (11th Cir. 1991) ……………………………….... 28, 29, 30

*Feliciano v. City of Miami Beach*,
707 F.3d 1244,1252 (11th Cir. 2013) ……………………………………..… 12

*Freeman v. Key Largo Volunteer Fire and Rescue Dept. Inc.*,
494 Fed. Appx 940,  (11th Cir 2012) ……………………………………..… 14

*Freund v. Hi–Tech Satellite, Inc*.,
185 Fed.Appx. 782, 783 (11th Cir.2006) ……………………………….. 14, 15, 25

*Gelber v. Akal Security, Inc*.,
14 F.4th 1279 (11th Cir. 2021) ………………………………………….. 29, 35

*Guerrero v. Moral Home Services, Inc*.,
247 F. Supp. 3d 1288, 1293–94 (S.D. Fla. 2017) …………………………...…. 33

*Hernandez v. Schloss,*
2020 WL 1228644, *1, *2 (S.D. NY March 13, 2020) ……………………..…. 33

*Hughes v. Family Life Care, Inc*.,
117 F.Supp.3d 1365, 1372 (N.D. Fla. 2015) ……………………………….. 22

*Joiner v. City of Macon*,
814 F.2d 1537, 1539 (11th Cir.1987) …………………………………….….. 28

*Layton v. DHL Express (USA), Inc.*,
686 F.3d 1172, 1178 (11th Cir. 2012) …………………………..…….. 16, 20

*Martinez-Mendoza v. Champion Int'l Corp*.,
340 F.3d 1200, 1209-10 (11th Cir. 2003) ……………………………..….. 16

*Miller v. Harget*,
458 F.3d 1251, 1256 (11th Cir. 2006) …………………………………… 13

*Molina v. South Florida Exp. Bankserv, Inc*,
420 F. Supp.2d 1276, 1287 (M.D. Fla. 2006) ……………………………. 24

*Powell v. Carey International, Inc*.,
483 F. Supp. 2d 1168, 1184–85 (S.D. Fla. 2007) …………………….. 31, 32

*Reich v. Southern New England Telecomms. Corp.,*
121 F.3d 58, 71 (2d Cir. 1997) ……………………………………….…. 33

*Rodriguez v. Farm Stores Grocery, Inc.*,
518 F.3d 1259, 1272 (11th Cir. 2008) ……………………….... 27, 28, 30, 34

*Rutherford Food Corp. v. McComb*,
331 U.S. 722, 727 (1947) ………………………………………...…….. 13

*Santelices v. Cable Wiring and South Florida Cable Contractors, Inc*.,
147 F.Supp.2d 1313, 1318 (S.D. Fla. March 6, 2001) ……………………. 13

*Scantland v. Jeffry Knight, Inc.*,
721 F.3d 1308 (11th Cir.2013) ……………………….… 13, 14, 15, 19, 21, 23, 25

*Usery v. Pilgrim Equip. Co., Inc.*,
1308, 1310-11 (5th Cir. 1976) ……………………………...… 13, 14, 15, 16

*Watts v. Club Madonna, Inc. et al*, Case No. 1:17-cv-24666-UU,
2018 U.S. Dist. LEXIS 202258, at *5-6 (S.D. Fla. June 25, 2018) …………...16, 26

*Yilmaz v. Mann*,
2014 WL1018006, at *5, (S.D. Fla. 2014) ……………………………..… 19

**STATUTES**

28 U.S.C. § 1331 ……………………………………………...…… 1

29 U.S.C. § 201…………………………………………………..… 1

29 U.S.C. § 206 …………………………………………………….….. 14

29 U.S.C. § 207 ………………………………………………..…. 14

29 U.S.C. § 209 …………………………………………………..… 1

29 U.S.C. § 216 ……………………………………………...…… 1, 29

29 U.S.C. § 218(a) ………………………………………………...… 1

29 U.S.C. § 260 . ……………………...……. 27, 28, 29, 30, 31, 32, 33, 34, 35, 36

**RULES**

Rule 56(f)(1), Federal Rules of Civil Procedure …………………………………. 13

**REGULATIONS**

29 CFR 531.35 ……………………………………………...…… 1

## STATEMENT OF JURISDICTION

The Southern District of Florida had subject matter jurisdiction to hear the lower court case pursuant to 28 U.S.C. § 1331, as the case arose under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201-209, 29 U.S.C. § 218(a), FLSA 16(b), 29 U.S.C. § 216, and 29 CFR 531.35, and thus presented a federal question.

## STATEMENT OF THE ISSUE

1. Under the FLSA, was Plaintiff-Appellant, CRISTIAN DIAZ-PIEDRA, considered an independent contractor as opposed to an employee to warrant denial of his Motions for Partial Summary Judgment and dismissal of his claim?
2. Whether the district court erred in denying DIAZ-PIEDRA's Motion for Partial Summary Judgment and dismissing DIAZ-PIEDRA's case when the record evidence demonstrated DIAZ-PIEDRA was not entitled to damages, including liquidated damages?

## STATEMENT OF THE CASE

### I. BACKGROUND FACTS

Cristian Diaz-Piedra ("DIAZ-PIEDRA) performed as a Disc Jockey ("DJ") for Defendants, Faneuil Entertainment, Inc. d/b/a Cheetah III and Jose R. Rodriguez from August 2019 through November 13, 2024. (Doc. 33 at 7). During the same period, DIAZ-PIEDRA, performed as a DJ for Defendant, The Set Enterprises, Inc., from August 2019 through October 2022. Defendants, Faneuil and Jose R. Rodriguez, operated the Cheetah's Gentlemen's Club located in Pompano Beach, Florida, and Defendant, The Set Enterprises, Inc. operated the Cheetah's Gentlemen's Club located in Hallandale Beach, Florida location. (Doc. 33 at 7-8).

At some point in 2022, Defendant, The Set Enterprises, Inc. was sold (the Hallandale Beach location) to a new owner. DIAZ-PIEDRA performed for this new owner approximately two months. (Doc. 59-1 at 27-28). At the same time, DIAZ-PIEDRA was performing as a DJ at the Faneuil Entertainment Club, (the Pompano Beach location). (Doc. 59-1 at 27:24- 28:5). For ease of reference, all Appellees/Defendants will be collectively referred to as "THE CLUBS" hereinafter.

DIAZ-PIEDRA began DJing when he was younger and stated that it took a lot of skill to be a DJ. (Doc. 59-1 43-44). DIAZ-PIEDRA performed at different gentleman's clubs prior to performing for THE CLUBS. (Doc. 59-1 at 10-15). It is

undisputed that both of THE CLUBS' locations classified DIAZ-PIEDRA as an independent contractor. (Doc. 33 at 8).

Both locations were open seven days a week. The Pompano location was open from 12:00 p.m. to 2:00 a.m. and the Hallandale location was open from 12:00 p.m. to 6:00 a.m. (Doc. 55 at 3). DJs came in to perform whenever they wanted; they did not have to be at any Club at a certain time nor leave at a certain time, other than when the Clubs closed. (Doc. 55-3 at 37:22-38:6.).

DJs independently selected the days they wanted to perform. (Doc. 55-3 at 35:24-36:2). There was no minimum number of "shifts" that a DJ had to perform. (Doc. 55-3 at 38:10-12). DJs could perform whenever they wanted, and show up as minimally as they wanted, including only one performance a month or a performance every day of the week. (Doc. 55-3 at 38:13-17). DIAZ-PIEDRA performed three nights at Pompano and then switched to two nights at Pompano and two nights at Hallandale. (Doc. 59-1 at 27:14-18). Although DIAZ-PIEDRA claims that he only performed at THE CLUBS, DJ's had full discretion to perform at any club, including competing clubs. (Doc. 55-3 and 39:13-18).

THE CLUBS do not train DJ's; they simply gave an audition and exhibited their own skill set and abilities as a DJ. (ECF Doc. 55-3 at 32:2-3.). The DJ's had to audition to show they had the proper skill set. (Doc. 55-3 at 31:19-20). The DJ's

brought in their own equipment and their own music to audition and perform. (Doc. 55-3 at 32:3-4).

No DJ's performance was an integral part of the operation of THE CLUBS. The CLUBS could operate a gentlemen's club with no music, or with THE CLUBS' own music from any source including a laptop or any other device that could play music. (Doc. 55-3 at 82:10-17, and 89:16-20). DJs performed at multiple locations and could perform wherever they wanted. (Doc. 55-3 at 31:10-11).

While THE CLUBS were responsible for their own marketing of their locations, DJs also independently marketed themselves for performing in the Clubs, preferably to establish followers of a specific DJ for that DJ's independent skills and choice of music. (Doc. 55-3 at 33:25-34:7). DIAZ-PIEDRA brought his own laptop, music, and microphone to DJ at THE CLUBS. (Doc. 55-3 at 57:19-22.). DJs controlled their stage set and lighting. (ECF Doc. 55-3 at 62:5-7). The DJ's music was broadcast through the sound system and PA system THE CLUBS had for all "public address" activities. (Doc. 55-3 at 60).

DJs could play whatever music they wanted without the approval of management. (Doc. 55-3 at 88:22-89:4). DJs could change their music during their performance. (Doc. 55-3 at 89:5-13.). The only music that DIAZ-PIEDRA was suggested not to play was "violent music." (Doc. Doc. 55-3 at 66:21-67:4). DJs could decide not to play any requested music by anyone. (Doc. 55-3 at 67:23-25.).

As required by music licensing companies for venues, THE CLUBS purchased their own music licenses with BMI for $372.00 a month and ASCAP for $2,143.00 for the year. (Doc. 55-3 at 57-60). THE CLUBS paid the same amount for these licenses no matter how many DJs were using the licenses. (Doc. 55-3 at 60). These licenses would be required if any music was being played even without the use of a DJ.

No rules or procedures were posted for the DJs. (Doc. 55-3 at 34:11-18). THE CLUBS did not give DJ's any formal performance review and only told them that they were doing well or if they weren't doing the right thing. (Doc. 55-3 at 32:11-19). Management at THE CLUBS did not have meetings with DJs to discuss any requirements for their performance. (ECF Doc. 55-3 at 35:5-11). DJs were allowed to hire anyone to support them in their performances. (Doc. 55-3 at 42:8-10).

DIAZ-PIEDRA'S income was derived from tips the entertainers/dancers provided him and from customers. (Doc. 55 at 4). DJ's earnings were based on their skill and performance as exhibited through the appreciation of dancers/entertainers and customers. (Doc. 55-3 at 44:7-15). DIAZ-PIEDRA received between two to ninety-six dollars ($2-$96) per entertainer per shift that DIAZ-PIEDRA performed. (ECF Doc. 29-3). DIAZ-PIEDRA would make on average $800.00 a night. (Doc. 59 at 26:7-9). DJs had the ability to negotiate the amount given to them by the entertainers. (Doc. 55-3 at 77:16-20). Although DIAZ-PIEDRA provided 10% of the amounts received from entertainers, which was negotiated by DIAZ-PIEDRA in his

contract. (Doc. 55-3 at 47:3-22). DIAZ-PIEDRA was terminated was for "shaking down" dancers/entertainers for more and more money and for being rude to other dancers/entertainers. DIAZ-PIEDRA would "shake down'" the dancers/entertainers to the point of alienating them, where the girls did not want to come to perform at THE CLUBS anymore because they were being made uncomfortable and pressured by DIAZ-PIEDRA. (ECF Doc. 55-3 at26:19-24. 53:3-13). Sometime after his termination, DIAZ-PIEDRA filed suit.

## II. PERTINENT COURSE OF TRIAL-LEVEL PROCEEDINGS

In his Amended Complaint, DIAZ-PIEDRA alleged that THE CLUBS improperly classified DIAZ-PIEDRA as an independent contractor and failed to properly compensate him under the FLSA and Florida Law. (Doc. 33). As part of the Amended Complaint, DIAZ-PIEDRA estimated the number of hours and rate of pay for each of THE CLUBS' locations that improperly compensated DIAZ-PIEDRA for his performance. Doc. 33 at 2-3). THE CLUBS filed an Answer and Affirmative Defenses to the Amended Complaint contending it properly classified DIAZ-PIEDRA as an independent contractor and denied that DIAZ-PIEDRA was owed any compensation under the FLSA and/or Florida Law. (Doc. 45).

As the case progressed, the parties then engaged in discovery, which included the depositions of THE CLUBS' corporate representative ("CR"), Rick Rodriguez, and DIAZ-PIEDRA. (Doc. 55-3; Doc. 59-1). Thereafter, DIAZ-PIEDRA filed his

Motion for Partial Summary Judgment. (Doc. 54; Doc. 55; Doc. 55-1 through 55-4; Doc. 61). In his motion, DIAZ-PIEDRA argued that DIAZ-PIEDRA was an employee—and not an independent contractor—under the FLSA. (Doc. 54). DIAZ-PIEDRA further argued that whether an individual is an employee under the FLSA was based upon six factors outlined in the economic realities test. DIAZ-PIEDRA also asserted that DIAZ-PIEDRA was entitled to damages, including mandatory liquidated damages.

THE CLUBS responded to DIAZ-PIEDRA's motion and addressed each of the six factors. THE CLUBS contended it properly classified DIAZ-PIEDRA as an independent contractor and that DIAZ-PIEDRA was not an employee under the FLSA. (Doc. 58; Doc. 59; Doc. 59-1). THE CLUBS also asserted that they acted in good faith and reasonably believed it complied with the FLSA, (Doc. 58). DIAZ-PIEDRA then filed his Reply in Support of Plaintiff's Motion for Summary Judgment. (Doc. 60).

Thereafter, the district court entered its order denying DIAZ-PIEDRA's motion. (Doc. 62). Although the district court concluded that THE CLUBS controlled DIAZ-PIEDRA's performance and ability to make a profit, the district court concluded that the remaining factors were either "equipoise" or weighed in favor of THE CLUBS. As a result, the district court denied DIAZ-PIEDRA's motion and dismissed his claims. This timely appeal ensued. (Doc. 63).

## SUMMARY OF THE ARGUMENT

The district court's denial of DIAZ-PIEDRA's Motion for Partial Summary Judgment and dismissal of his claims must be affirmed because the record evidence demonstrated DIAZ-PIEDRA was an independent contractor under the FLSA, and that DIAZ-PIEDRA, therefore, was not entitled to damages, including liquidated damages.

Courts evaluate six factors pursuant to the economic realities test to determine whether a person is an employee or independent contractor under the FLSA. In sum, those factors include: 1) the employer's control of the manner in which the work is performed, 2) the employee's opportunity for profit or loss, 3) the employee's investment in the equipment and materials to perform the employees task, 4) whether the service rendered by the employee requires a special skill, 5) the permanency and duration of the working relationship, and 6) the extent to which the employee's work is an integral part of the employer's business.

No one factor is determinative. Instead, courts look to the totality of the circumstances to determine whether the worker was economically dependent on the employer, or, rather, in business for himself. When the factors weigh in favor of the worker is in business for himself, the worker is deemed an independent contractor under the FLSA.

DIAZ-PIEDRA controlled all material aspects of his performance and ability to make a profit. DIAZ-PIEDRA's investments in equipment and materials were more significant than THE CLUBS and as DIAZ-PIEDRA's own testimony conceded that DJing required a lot of skill. DIAZ-PIEDRA could perform at any other Club including any competing Clubs. DIAZ-PIEDRA performed at The Set Enterprises, Inc., and Faneuil Entertainment, Inc., while they were under separate ownership and competing clubs without either The Set or Faneuil having any issues with DIAZ-PIEDRA performing at both clubs. Finally, DIAZ- PIEDRA's performance as a DJ was not integral to THE CLUBS' business, as THE CLUBS could play music from any system, computer, or source, not requiring a DJ's performance. As such, the district court correctly found that DIAZ-PIEDRA was an independent contractor under the FLSA.

THE CLUBS acted in good faith by fully evaluating all of the elements set forth above in concluding that the DIAZ-PIEDRA was treated as an independent contractor. (1) THE CLUBS exercise virtually no control as to the manner in which DIAZ-PIEDRA played his music; (2) DIAZ-PIEDRA opportunity for profit or loss depended entirely on his own artistic social contact with performers; (3) DIAZ-PIEDRA was fully responsible for the choice and equipment used to convey the music he chose to play, and DIAZ-PIEDRA could hire his own helpers to support his performance; (4) DIAZ-PIEDRA possessed the requisite skills to be a successful

DJ; (5) the DIAZ-PIEDRA could have, and did, perform at any club he so chose; and (6) DIAZ-PIEDRA's DJ services could be replaced by any device, software or other source of music, live or recorded.

THE CLUBS consistently maintained that DIAZ-PIEDRA was properly classified as an independent contractor based upon the nature and structure of the DJ relationship. The record included evidence concerning the circumstances underlying that classification, including that DJs selected when they would perform, were not required to perform a minimum number of shifts, could perform at other clubs, brought their own music and equipment, exercised substantial control over their performances, and were compensated from amounts received from entertainers and customers. Those facts are relevant to the separate question of whether THE CLUBS had a reasonable basis for the classification they made. An employer's good-faith belief concerning independent-contractor status itself can be relevant to the inquiry of liquidated damages. DIAZ-PIEDRA is not entitled to liquidated damages based on THE CLUBS showing of good faith in treating DIAZ-PIEDRA as an independent contractor.

## ARGUMENT

### I. THE DISTRICT COURT'S DECISION MUST BE AFFIRMED BECAUSE THE RECORD EVIDENCE DEMONSTRATED DIAZ-PIEDRA WAS AN INDEPENDENT CONTRACTOR UNDER THE FLSA

DIAZ-PIEDRA performed as a DJ in two gentlemen's clubs owned and operated by the Appellees. Under the totality of the circumstances, the overarching defense to DIAZ-PIEDRA's Complaint is that DIAZ-PIEDRA was economically independent and had control over nearly every aspect of his own performances. As such, DIAZ-PIEDRA was properly classified as an independent contractor. Accordingly, the record evidence and law cited herein supports affirming the district court's order denying DIAZ-PIEDRA's Motion for Summary Judgment and finding that DIAZ-PIEDRA was an independent contractor.

#### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, "courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version." *Feliciano v. City of Miami Beach*, 707 F.3d 1244,1252 (11th Cir. 2013). "Even if a district court "believes that the evidence presented by

one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." *Id*. (quoting *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006). This is because credibility determinations and the weighing of evidence "are jury functions, not those of a judge." *Id*. (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Under Rule 56(f)(1), Federal Rules of Civil Procedure, "after giving notice and a reasonable time to respond, the court may grant summary judgment for a nonmovant."

**B. THE FAIR LABOR STANDARDS ACT AND ITS APPLICATION**

As DIAZ-PIEDRA has pointed out, in 1938, Congress passed the FLSA to lessen, if not eliminate, the distribution in commerce of goods produced under deficient labor conditions. *Santelices v. Cable Wiring and South Florida Cable Contractors, Inc*., 147 F.Supp.2d 1313, 1318 (S.D. Fla. March 6, 2001). The purpose of the FLSA was to "'eliminate low wages and long hours' and 'free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers.'" *Usery v. Pilgrim Equip. Co., Inc*., 1308, 1310-11 (5th Cir. 1976); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947); *Scantland*, 721 F.3d at 1311 (the FLSA was passed to "lessen, so far as seemed then practicable, the distribution in commerce of goods produced under subnormal labor conditions") (quoting *Rutherford*). "These protections, however, extend only to 'employees,' a term given rough outline by a series of broad

definitions in the Act. 29 U.S.C. §§ 206, 207." *Id*. "These 'broad' definitions do not, however, bring 'independent contractors' within the FLSA's ambit. *Id.* (citations omitted).

To determine if an individual is an independent contractor or an employee, a variety of elements are evaluated. This Court has stated "we look at the 'economic reality' of all the circumstances" surrounding the activity. *Freeman v. Key Largo Volunteer Fire and Rescue Dept. Inc.*, 494 Fed. Appx 940, (11th Cir 2012) (citing *Brouwer v. Metro Dade Cnty*., 139 F.3d 817, 819 (11th Cir. 1998). The touchstone of the "economic reality test" is the alleged employee's economic dependence on the employer. *Id*. (citing *Freund v. Hi–Tech Satellite, Inc*., 185 Fed.Appx. 782, 783 (11th Cir.2006) (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir.1976)). "[T]he final and determinative question must be whether ... the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit." *Id.* (citing *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir.1976).

Courts have viewed the following factors as a guide to determine the economic realities of working relationships in FLSA cases:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Freund v. Hi–Tech Satellite, Inc.,* 185 Fed.Appx. 782, 783 (11th Cir.2006).

"No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor—economic dependence." *Id*. (citing *Usery v. Pilgrim Equip. Co*., 527 F.2d 1308, 1311 (5th Cir.1976). Here, there is no question that DIAZ-PIEDRA was not economically dependent on THE CLUBS, as found by the district court and as explained in the following sections.

### C. DIAZ-PIEDRA CONTROLLED ALL MATERIAL ASPECTS OF HIS PERFORMANCE.

The first factor in the economic realities test considers "the nature and degree of the alleged employer's control as to the manner in which the work is to be performed." *Freund v. Hi–Tech Satellite, Inc*., 185 Fed.Appx. at 783. The critical inquiry is whether Defendants exerted sufficient "control over a meaningful part of [Plaintiff's] business" such that Plaintiff did not stand as a "separate economic entity" in business for himself. *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1313

(11th Cir.2013) (quoting *Usery v. Pilgrim Equip Co*., 527 F.2d 1308, 1312-13 (5th Cir. 1976)).

"Control arises when the purported employer goes beyond general instructions and begins to assign specific tasks, specific workers, or to take an overtly active role in the oversight of the work. *Diego v. Victory Lab, Inc.*, 282 F.Supp.3d 1275, 1281 (S.D. Fla. 2017) (citing *Amiable v. Long & Scott Farms*, 20 F. 3d 434, 441 (11th Cir. 1994).

Status as an employee begins only when a purported employer takes an overly active role in the oversight of work "when it decides such things as (1) for whom and how many employees to hire; (2) how to design the employees' management structure; (3) when work begins each day; (4) when the laborers shall start and stop their work throughout the day; and (5) whether a laborer should be disciplined or retained." *Layton v. DHL Express (USA), Inc.*, 686 F.3d 1172, 1178 (11th Cir. 2012) (quoting *Martinez-Mendoza v. Champion Int'l Corp*., 340 F.3d 1200, 1209-10 (11th Cir. 2003)); see also *Watts v. Club Madonna, Inc. et al*, Case No. 1:17-cv-24666-UU, 2018 U.S. Dist. LEXIS 202258, at *5-6 (S.D. Fla. June 25, 2018). Here, the facts demonstrate that THE CLUBS exercised only minimal guidance over the performance of DIAZ-PIEDRA. As such, this factor weighs heavily in favor of independent contractor status.

Although the district court was concerned with the fact that if the DJ picked his shift, they needed to find coverage if they couldn't fulfill the entire shift, however, DJs picked the days that they want to perform. (Doc. 55-3 at35:24-36:2). DJs could start their performances anytime they wanted and did not have to arrive at a certain time nor leave at a certain time, except when THE CLUBS were closed. (Doc. 55-3 at 37:22-38:6). Providing availability to your employer and having your employer decide what days you work is different from DIAZ-PIEDRA picking his own schedule and even deciding to perform seven days a week or one day a month. (Doc. 55-3 at 38:13-17). DJs did not have to perform a certain number of shifts; they could perform as many or as few shifts as they want. (Doc. 55-3 at 38:10-12).

Additionally, DJ's had significant control over their performance. DJs could play any music they wanted as long as it was not "violent." (Doc. Doc. 55-3 at 66:21-67:4). DJs controlled their own set list and played music they created. (Doc. 55-3 at 88:22-89:4). DJs could change their set list while they were performing. (Doc. 55-3 at 89:5-13). DJs could deny requests from customers. (Doc. 55-3 at 67:23-25). DJ'S controlled their own lighting. (Doc. 55-3 at 62:5-7). DJs could hire anyone to support them during their performances. (Doc. 55-3 at 42:8-10).

DIAZ-PIEDRA asserts that he was terminated for "playing genres of music that were prohibited, and Plaintiff's termination came in part because of his playing of certain music in attempt to get additional gratuity." This is simply false; DIAZ-

PIEDRA was terminated for "shaking down" entertainers/dancers for more money and for being rude to other entertainers he did not think were providing him with sufficient gratuities. (Doc. 55-3 at 26:19-24 and 53:3-13).

DJs were not subject to "performance reviews between managers and the DJ." THE CLUBS never had meetings with DJs, and THE CLUBS never gave any DJ any actual performance review. At most, management would verbally tell them, "you're doing well," or "you're not doing the right thing" or other comments. (Doc. 55-3 at 32:11-19). This does not go past general instruction but rather is simply minimal guidance to help support the performance of the DJ. See *Diego v. Victory Lab, Inc.*, 282 F. Supp. 3d 1275, 1282 (S.D. Fla. 2017) (Finding that a company who provided technical assistance, materials, required independent contractors to meet at a specific place, and assigned a specific area, provided limited training on first day, had them record their times, adhere to dress code and be disciplined for certain behavior did not go beyond providing general instruction and simply provided minimal guidance to support work and collect data).

Overall, THE CLUBS had only general guidelines and limited any "control" to not imposing economic burdens on the performers, i.e. "shaking them down," or expecting the DJ's to not be rude or disrespectful of the performers, and to not play "violent music." DIAZ-PIEDRA had significant control over his hours, the days he performed, how often he performed, whether he employed others to support his

performance, choosing his music, his lighting, the equipment he wanted to use and being entirely responsible for his "performance." Based on the above evidence, it is clear that this first factor weighs in favor of meeting this element to establish that DIAZ-PIEDRA is an independent contractor.

### D. DIAZ-PIEDRA CONTROLLED HIS OWN OPPORTUNITY FOR PROFIT AND LOSS.

The next factor in the "economic realities test" considers the "alleged employee's opportunity for profit or loss depending on his managerial skill." *Yilmaz v. Mann*, 2014 WL1018006, at *5, (S.D. Fla. 2014) (quoting *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1312 (11th Cir.2013). "An independent contractor profits from his own managerial skill, an employee from the skill of others." Id. Such managerial skills include control over price, and the choice of location, advertising, and services provided, see *Id*. (citing *Usery v. Pilgrim Equipment Co*., 527 F.2d 1308, 1313 (5th Cir.1976) and *Scantland v. Jeffry Knight, Inc*., 721 F.3d 1308, 1312 (11th Cir.2013)).

Although the district court felt that even though DIAZ-PIEDRA had the ability to market himself and could play music that the entertainers preferred, there was no evidence in the record that any of that would actually change his compensation. With all due respect, catering to a performer's chosen music is a significant factor in the determination of how much a performer/dancer and a customer will tip the DJ.

DIAZ-PIEDRA did control his opportunity for profit and loss. DIAZ-PIEDRA had the ability to drive profit or avoid loss by having the required performance skill. (Doc. 55-3 at 44:7-15). DIAZ-PIEDRA had control over his music and type of performance he gave as stated above. (Doc. 55-3 at 88:22-89:4). DIAZ-PIEDRA was also able to advertise himself. (ECF Doc. 55-3 at 33:25-34:7). Additionally, DIAZ-PIEDRA was able to ingratiate himself and please the performers dancing to his music by independently establishing what music the dancers preferred him to play for their performances, which was a legitimate way for him to negotiate his income from the performers. (Doc. 55-3 at 88:22-89:4). Finally, DIAZ-PIEDRA could hire his own helpers to support his performance. (Doc. 55-3 at 42:8-10).

Overall, we respectfully submit that DIAZ-PIEDRA had the opportunity for profit or loss under his own control, as such this element favors strongly towards independent contractor status.

### E. DIAZ-PIEDRA INVESTMENT EXCEEDS THE CLUBS INVESTMENT.

The next factor from the "economic realities test" is a review of the ownership of facilities and equipment utilized in the work relationship because "workers are more likely to be economically dependent on the person who supplies the equipment or the facilities." *Layton v. DHL Express*, 686 F.3d 1172, 1176 (11th Cir. 2012).

Even though the district court found this concept to be "in equipoise," DIAZ-PIEDRA supplied his own music, laptop, and microphone. (Doc. 55-3 at 57:19-22

and 59-1 at 20:2-5). THE CLUBS only contributed minimally by maintain utility and overhead expenses, as well as the basics of equipment, such as a PA system could be used by anyone in the clubs for any purpose. It is respectfully submitted that it is the music that is the most important aspect of the "investment" of performing as a DJ, particularly when the PA system can be used for any purpose, including generic announcements, etc.

As far as the music licenses held by THE CLUBS that DIAZ-PIEDRA establishes as some element in his favor, these music licenses are required by music licensing companies for venues, not DJ's THE CLUBS purchased their own music licenses with BMI for $372.00 a month and ASCAP for $2,143.00 for the year. (Doc. 55-3 at 57-60). THE CLUBS paid the same amount for these licenses no matter how many DJs were using the licenses. (Doc. 55-3 at 60). These licenses would be required if any music was being played even without the use of a DJ. DIAZ-PIEDRA provided the equipment necessary for his performance, and THE CLUBS only contributed minimally. DIAZ-PIEDRA was economically independent, and the evidence fully supports this element being sufficient to establish that the DIAZ-PIEDRA was an independent contractor.

## F. DIAZ-PIEDRA REQUIRED THE SPECIAL SKILL NECESSARY FOR INDEPENDENT CONTRACTOR STATUS.

The fourth factor from the "economic realities test" considers whether the service rendered requires a special skill. *Scantland*, 721 F.3d at 1318. "The relevant

inquiry here is whether [Plaintiff] is dependent upon [Defendants] to equip [his] with the skills necessary to perform [his] job." *Hughes v. Family Life Care, Inc.*, 117 F.Supp.3d 1365, 1372 (N.D. Fla. 2015). The district court clearly found that the facts and evidence supported the finding that DIAZ-PIEDRA is an independent contractor on this issue.

DIAZ-PIEDRA conceded that "Plaintiff admittedly has some skill in selecting which song to play and how to use the Defendants' equipment." It is important to note that DIAZ-PIEDRA testified that "***it takes a lot of skill to do that job***." (Doc. 59-1 at 43:16-44:5). (emphasis added). Notably, THE CLUBS established that they do not train any of the DJ's and the DJ's must come in with the skill necessary to do their performance. (Doc. 55-3 at 32:2-3).

DIAZ -PIEDRA is in error to state that DJs are not selected by their skill and therefore they do not require that especial skill set necessary for independent contractor status. Independent contractors are in business for themselves; their skill is needed for the performance of DIAZ -PIEDRA's own work. However, DJ's, such as DIAZ -PIEDRA, do not depend on THE CLUBS to equip them with the skills necessary to perform. (Doc. 55-3 at 32:2-3). The efforts in DIAZ-PIEDRA's operative Brief to minimize his own admissions as to the high level of skill necessary to be a DJ.

The only requirement is to have the skills necessary to perform as a successful DJ, something that THE CLUBS would have no input into. (Doc. 55-3 at 31:19-20). This in no way means, nor should it suggest, that the DJ's do not have the skills necessary to perform because they are not selected by THE CLUBS to perform certain days. The skill necessary to perform is a prerequisite to even being able to choose a day to perform, and to suggest otherwise is simply inane. Also, to rely on case law regarding the element of skill applicable to an exotic dancer as it pertains to the FLSA, the amount of technical skill and knowledge of the use of equipment reflects a skill significantly more complex than "shaking one's booty."[1]

DJs exhibit a vast number of skills in performing, and DIAZ-PIEDRA does not depend on THE CLUBS to equip him with the skills necessary for the job, therefore, as the district court found, this factor weighs in favor of independent contractor status.

## G. THERE IS NO PRESET DURATION OF EMPLOYMENT.

The next factor from the economic realities test is for the Court to consider the "degree of permanency and duration of the working relationship." *Scantland*, 721 F.3d at 1312. As DIAZ-PIDRA testified, he performed as a DJ at multiple

---

[1] With all due respect to KC & Sunshine Band's "(Shake, Shake, Shake) Shake Your Booty," the 1976 disco hit from their album "Part 3," which reached number one on the US Billboard Hot 100 and the Hot Soul Singles chart, becoming the group's third number-one hit.

different Clubs, therefore that shows that DJs were fungible regardless of the length of their relationship. (Doc. 59-1 at 12:4-15:17).

As the district court properly found,

> While Plaintiff worked for an extended period for Defendants, he was an at-will employee, who was not hired for any set duration and was terminable with twenty-four-hour notice. Plaintiff was also free to work for other companies as a DJ. Further, while there is evidence that Plaintiff did not DJ for anyone else, there is no evidence indicating that this was Plaintiff's only job. Thus, this factor weighs slightly in favor of independent contractor because Plaintiff was terminable at will and was not prevented from working as a DJ for others. worked for an extended period for Defendants, he was an at-will employee, who was not hired for any set duration and was terminable with twenty-four-hour notice. Plaintiff was also free to work for other companies as a DJ. Further, while there is evidence that Plaintiff did not DJ for anyone else, there is no evidence indicating that this was Plaintiff's only job. Thus, this factor weighs slightly in favor of independent contractor because Plaintiff was terminable at will and was not prevented from working as a DJ for others.

DIAZ-PIEDRA did not have a significant degree of permanence with THE CLUBS. DIAZ-PIEDRA was never contracted for a certain period of time. (Doc. 55-3 at 42:22-43:2). DIAZ-PIEDRA could perform wherever he wanted while performing at THE CLUBS. (Doc. 55-3 at 31:10-11). DIAZ-PIEDRA could perform at competing clubs. (Doc. 55-3 at 39:13-18). DIAZ-PIEDRA picked when he wanted to perform at THE CLUBS. (Doc. 55-3 at 35:24-36:2). See *Molina v. South Florida Exp. Bankserv, Inc*, 420 F. Supp.2d 1276, 1287 (M.D. Fla. 2006) (Finding that even though the Plaintiffs worked for Defendant for more than two-years, facts pointed to independent contractor statutes where the Independent Contractor Agreement were

terminable upon twenty four hour notice and that the Plaintiffs were free to work for other companies during their time at the Defendants); See also *Freund v. Hi-Tech Satellite, Inc*., 185 Fed.Appx. 782, 784 ("Just because [Plaintiff] worked six days a week does not mean that he had to, especially in light of the evidence that other installers did not. Under [Plaintiff's] logic, we would be compelled to determine, in another type of case, that a firm did not give sick days if the employee never took them").

Additionally, DIAZ-PIEDRA assertion that he could not perform at competing clubs goes against his own testimony. DIAZ-PIEDRA stated in his deposition that he performed at The Set Enterprises, Inc., and Faneuil Entertainment, Inc., while they were under separate ownership and competing clubs without either The Set or Faneuil having any issues with DIAZ-PIEDRA performing at both clubs. (Doc. 59-1 at 28:24- 28:5).

DIAZ-PIEDRA independently determined when he performed and could perform at any other competing club while performing at THE CLUBS. This factor was correctly decided by the district court that it weighed in favor of independent contractor status.

## H. DJS ARE NOT INTEGRAL TO THE CLUBS' BUSINESS.

The last factor from the "economic realities test" considers whether the services provided by DJs were integral to Defendants' business. *Scantland*, 721 F.3d

at 1319. As discussed at length herein, the record evidence in the case demonstrates that this factor favors independent contractor status.

Contrary to the arguments made by DIAZ-PIEDRA, and the argument that DJs were "integral" to the operation of THE CLUBS, the district court found that they were not integral under the authority of *Watts v. Club Madonna, Inc. et al*, Case No. 1:17-cv-24666-UU, 2018 U.S. Dist. LEXIS 202258, at *5-6 (S.D. Fla. June 25, 2018):

> In *Watts*, the district court found that while "music was certainly integral to the dancers and the dancers to the club, the DJs' job could have been performed by an automated playlist" and, therefore, this factor weighed against employee status. *Id*. However, in *Watts* the DJ did not control the music played, which was set by the club, and there was no evidence that the DJ announced the entertainers. Here, the testimony is that the services provided by the DJs, including Plaintiff, were choosing the music and announcing the dancers. While the Court agrees that music is integral to the Clubs, the Court finds that the DJs' services—choosing the music and announcing the dancers—were not integral to the Clubs' business. Consequently, this factor weighs in favor of independent contractor.

To reiterate THE CLUBS' position, they can operate without a DJ either by having music generated by any number of prerecorded sources, or using music from computers, as THE CLUBS have done on some occasions. (Doc. 55-3 at 82:10-17 and 89:16-20). Therefore, DJs are not an integral part of THE CLUBS business, and the district court was correct in finding that this factor weighed in favor of DIAZ-PIEDRA being an independent contractor.

## II. WHETHER THE DISTRICT COURT ERRED IN DENYING DIAZ-PIEDRA'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DISMISSING DIAZ-PIEDRA'S CASE WHEN THE RECORD EVIDENCED DEMONSTRATED DIAZ-PIEDRA WAS NOT ENTITLED TO DAMAGES, INCLUDING LIQUIDATED DAMAGES?

THE CLUBS acted in good faith by fully evaluating all of the elements set forth above in concluding that the DIAZ-PIEDRA was treated as an independent contractor. As shown above, (1) THE CLUBS exercise virtually no control as to the manner in which DIAZ-PIEDRA played his music; (2) DIAZ-PIEDRA opportunity for profit or loss depended entirely on his own artistic social contact with performers; (3) DIAZ-PIEDRA was fully responsible for the choice and equipment used to convey the music he chose to play, and DIAZ-PIEDRA could hire his own helpers to support his performance; (4) DIAZ-PIEDRA possessed the requisite skills to be a successful DJ; (5) the DIAZ-PIEDRA could have, and did, perform at any club he so chose; and (6) DIAZ-PIEDRA's DJ services could be replaced by any device, software or other source of music, live or recorded.

"The Portal to Portal Act, 29 U.S.C. §§ 251–62, which amended the FLSA, provides a safe harbor for an employer who can establish that it acted in good faith and under the reasonable belief that it was in compliance with the FLSA." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1272 (11th Cir. 2008) (citing 29 U.S.C. § 260). The safe harbor provision provides:

> In any action ... to recover ... unpaid overtime compensation, or liquidated damages, under the [FLSA] ..., if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation ... the court may, in its sound discretion, award no liquidated damages ....

*Id*. An employer who violates the FLSA's overtime provision carries the burden of proving its entitlement to the safe harbor. *Id*. (citing *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir.1987). To satisfy the good faith requirement, an employer must show that it acted with both objective and subjective good faith. *Id*. (citing *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1566–67 (11th Cir. 1991).

THE CLUBS can meet this burden by showing that they fully and fairly evaluated all relevant elements to determine that DIAZ-PIEDRA was an independent contractor prior to this action having been filed. Based on the forgoing, DIAZ-PIEDRA is not entitled to liquidated damages based on THE CLUBS' showing of good faith in treating the DIAZ-PIEDRA as an independent contractor.

### A. EVEN IF DIAZ-PIEDRA COULD BE CLASSIFIED AS AN EMPLOYEE, THE CLUBS' GOOD-FAITH AND REASONABLE-GROUNDS DEFENSE PRECLUDES AN AUTOMATIC AWARD OF LIQUIDATED DAMAGES UNDER 29 U.S.C. § 260.

DIAZ-PIEDRA's argument improperly collapses two distinct inquiries: whether he was an employee entitled to overtime under the FLSA and whether THE CLUBS can satisfy the separate good-faith defense to liquidated damages under 29

U.S.C. § 260. Even assuming, for purposes of argument, that this Court determines DIAZ-PIEDRA was an employee and that THE CLUBS violated the FLSA, that determination would not itself resolve whether liquidated damages must be awarded. Section 216(b) provides for liquidated damages, but § 260 expressly permits a court, in its discretion, to deny or reduce such damages where the employer establishes both good faith and reasonable grounds for believing its conduct complied with the FLSA. 29 U.S.C. §§ 216(b), 260.

The Eleventh Circuit recognizes this distinction. In *Gelber v. Akal Security, Inc.*, 14 F.4th 1279, 1288–89 (11th Cir. 2021), the Court affirmed the district court's determination that the employer acted in good faith and declined to disturb the denial of liquidated damages even though the employer had violated the FLSA. The employer had established the subjective and objective components of the § 260 defense, and the district court therefore did not abuse its discretion in declining to award liquidated damages. Thus, *Gelber* forecloses treating an FLSA violation as automatically establishing an entitlement to liquidated damages; the statutory inquiry under § 260 remains separate.

The governing test requires the employer to establish both subjective good faith and objectively reasonable grounds for believing that its conduct complied with the Act. *Dybach v. State of Fla. Dep't of Corr.*, 942 F.2d 1562, 1566–67 (11th Cir. 1991). Subjective good faith concerns whether the employer had an honest intention

to ascertain what the FLSA required and act accordingly, while the objective component requires reasonable grounds for believing the employer's conduct complied with the Act. Id. at 1566–67. The employer bears the burden of establishing both components, and the absence of either defeats the defense. *Id.*; *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150, 1163 (11th Cir. 2008).

DIAZ-PIEDRA relies heavily on THE CLUBS' failure to obtain advice from counsel or an administrative authority. That fact is relevant to the § 260 inquiry, but DIAZ-PIEDRA identifies no controlling authority holding that an employer's failure to consult counsel, the Department of Labor, or another outside authority is, standing alone, dispositive of the defense. On the contrary, the inquiry remains whether the employer established the statutory requirements based upon the circumstances surrounding the alleged violation. See 29 U.S.C. § 260; *Dybach*, 942 F.2d at 1566–67. Indeed, the Eleventh Circuit has treated the absence of consultation as a circumstance bearing on objective good faith, not as a categorical rule that eliminates the defense in every case. See *Rodriguez v. Farm Stores Grocery, Inc*., 518 F.3d 1259, 1272–73 (11th Cir. 2008); *Davila v. Menendez*, 717 F.3d 1179, 1186 (11th Cir. 2013).

Nor does *Davila* establish the categorical rule DIAZ-PIEDRA proposes. *Davila* explains that subjective good faith requires an honest intention to ascertain what the Act requires and to act accordingly. 717 F.3d at 1186. The decision therefore

addresses the evidentiary showing necessary to establish the statutory defense; it does not hold that an employer necessarily lacks good faith whenever it failed to obtain an outside legal opinion. The relevant inquiry remains whether THE CLUBS can establish the subjective and objective components of § 260 based on the evidence as a whole.

Here, THE CLUBS' position was not that they knowingly disregarded an FLSA obligation and simply elected not to comply. THE CLUBS consistently maintained that DIAZ-PIEDRA was properly classified as an independent contractor based upon the nature and structure of the DJ relationship. The record included evidence concerning the circumstances underlying that classification, including that DJs selected when they would perform, were not required to perform a minimum number of shifts, could perform at other clubs, brought their own music and equipment, exercised substantial control over their performances, and were compensated from amounts received from entertainers. Those facts are not offered as proof that the classification was necessarily correct; they are relevant to the separate question of whether THE CLUBS had a reasonable basis for the classification they made.

That distinction is particularly significant because courts have recognized that an employer's good-faith belief concerning independent-contractor status itself can be relevant to the § 260 inquiry. In *Powell v. Carey International, Inc.*, 483 F. Supp.

2d 1168, 1184–85 (S.D. Fla. 2007), the court considered a liquidated-damages claim brought by limousine drivers who challenged their classification as independent contractors. The defendants presented substantial factual support that they had withheld overtime based on a good-faith belief, supported by advice of counsel, that the drivers were independent contractors. The court therefore concluded that the record did not permit summary judgment establishing liquidated damages as a matter of law. *Id*. at 1184–85. Although *Powell* involved evidence of advice of counsel that is not present here, its significance is narrower and more useful: it confirms that the circumstances underlying an employer's independent-contractor classification can bear on the § 260 inquiry and that liquidated damages should not be imposed as a matter of law where the record presents evidence relevant to the employer's good-faith position.

Similarly, *Aidone v. Nationwide Auto Guard, L.L.C*., 295 F.R.D. 658, 662–63 (S.D. Fla. 2013), recognized the sufficiency of a pleaded defense based on the employer's good-faith belief that the plaintiff was an independent contractor. Although *Aidone* concerned the sufficiency of the pleadings rather than the ultimate evidentiary showing required under § 260, it further demonstrates that independent-contractor classification may be relevant to an employer's asserted good-faith defense where employee status itself is disputed.

The same principle appears in *Guerrero v. Moral Home Services, Inc*., 247 F. Supp. 3d 1288, 1293–94 (S.D. Fla. 2017). There, the court found an FLSA overtime violation for the relevant period but nevertheless concluded that the employer acted in good faith and had an objectively reasonable basis for its position concerning its FLSA obligations. The court accordingly granted summary judgment against liquidated-damages liability for the period covered by that finding. *Id*. *Guerrero* therefore illustrates that the existence of an underlying FLSA violation does not eliminate the independent § 260 inquiry.

DIAZ-PIEDRA's reliance on cases such as *Reich v. Southern New England Telecomms. Corp.,* 121 F.3d 58, 71 (2d Cir. 1997) and *Hernandez v. Schloss,* 2020 WL 1228644, *1, *2 (S.D. NY March 13, 2020) does not change that result. Those decisions reinforce the proposition that THE CLUBS bear the burden of establishing both good faith and reasonable grounds. THE CLUBS do not dispute that burden. In *Hernandez*, the court rejected reliance on conformity with industry practice as sufficient, standing alone, to establish good faith. THE CLUBS do not contend that industry practice, standing alone, establishes their entitlement to the § 260 defense. Rather, THE CLUBS' position rests upon the circumstances of the actual working relationship and the basis for their classification of DIAZ-PIEDRA. Thus, even accepting the propositions for which Reich and Hernandez were cited, neither case

establishes the categorical rule DIAZ-PIEDRA seeks, that failure to consult outside counsel automatically defeats § 260.

Nor does *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150 (11th Cir. 2008), compel the result DIAZ-PIEDRA seeks. *Alvarez Perez* held that a jury's finding of willfulness for purposes of the FLSA statute of limitations precluded a later finding of good faith for purposes of § 260. Id. at 1165–66. That distinction matters here. *Alvarez Perez* involved an actual finding of willfulness; it did not hold that a failure to consult counsel, standing alone, is equivalent to willfulness or conclusively establishes the absence of good faith. Nothing in DIAZ-PIEDRA's argument establishes that THE CLUBS have been found to have willfully violated the FLSA.

DIAZ-PIEDRA's reliance on *Rodriguez* likewise does not warrant the automatic award he seeks. *Rodriguez* recognizes that the employer bears the burden of establishing good faith and reasonable grounds and that evidence of consultation with the Department of Labor or an FLSA expert may support objective good faith. 518 F.3d at 1272–73. But that evidentiary consideration does not transform consultation into a statutory prerequisite. § 260 contains no requirement that an employer obtain legal advice before the defense becomes available. The question remains whether the employer has established both components of the defense from the circumstances and evidence presented.

Finally, the procedural posture matters. DIAZ-PIEDRA asks this Court to award liquidated damages as a matter of law based principally on the absence of outside consultation. But the record, as described by DIAZ-PIEDRA himself, reflects that the district court resolved the case on employee status and did not reach the issue of damages. Accordingly, this Court need not, and should not, treat the absence of a prior § 260 determination as a determination that THE CLUBS failed to satisfy § 260. Section 260 assigns the determination of good faith and reasonable grounds to the court, and the Eleventh Circuit recognizes that the ultimate decision concerning liquidated damages is reviewed for abuse of discretion. *Gelber*, 14 F.4th at 1288–89.

The issue before this Court is therefore narrower than DIAZ-PIEDRA suggests. If the Court reverses the district court's employee-status determination, the question of liquidated damages does not automatically resolve itself in DIAZ-PIEDRA's favor. The Court would still have to consider the separate requirements of § 260 and the evidence bearing on THE CLUBS' good faith and reasonable grounds.

Accordingly, even if this Court reverses the district court's determination concerning DIAZ-PIEDRA's employee status, it should not hold that liquidated damages necessarily follow. THE CLUBS are not asking this Court to hold that they have already conclusively established the § 260 defense. Rather, THE CLUBS

submit that DIAZ-PIEDRA has not established the opposite as a matter of law. THE CLUBS' classification of DIAZ-PIEDRA as an independent contractor, the circumstances underlying that classification, and THE CLUBS' asserted understanding of their FLSA obligations remain relevant to the separate inquiry required by § 260. DIAZ-PIEDRA's authorities establish THE CLUBS' burden; they do not establish that the absence of consultation with counsel conclusively defeats the defense. At minimum, DIAZ-PIEDRA cannot obtain an automatic award of liquidated damages merely because this Court might reverse the employee-status determination.

## CONCLUSION

Based on the foregoing arguments and authorities cited herein, the district court did not err in rendering its order and it does not warrant reversal under the facts of this case. Defendant-Appellees, THE CLUBS, respectfully request this Honorable Court issue an Opinion affirming the district court's order.

Respectfully submitted,

*/s/ Luke Lirot*
Luke Lirot, Esq.
Florida Bar No. 714836

*/s/ Rachel Ricks*
Rachel Ricks, Esq.
Florida Bar No. 1049469

**LUKE CHARLES LIROT, P.A.**
2240 Belleair Road, Suite 190

Clearwater, Florida 33764
Telephone: (727) 536-2100
Facsimile: (727) 536-2110
Email: team@lirotlaw.com
*Counsel for the Appellees*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 9,318 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Luke Lirot*
Luke Lirot, Esq.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 14, 2026, a true and correct copy of the foregoing was furnished via email to Appellant's Counsel, Earl I. Higgs, Jr., 1060 Woodcock Road, #109, Orlando, Florida 32803, at ehiggs@higgslawpa.com and ehenry@higgslawpa.com.

*/s/ Luke Lirot*
Luke Lirot, Esq.